We will proceed with American Contractors Supply LLC v. HD Supply Construction Supply Ltd. We will start with Mr. Berhold. Good morning, Your Honor. Jeff Berhold for American Contractors Supply, or ACS. May it please the Court, we already have a full record and extensive briefing. I want to take this opportunity to put a finer point on just a few things. Unilateral action, ball denials, and the role of the jury in the rule of reason. The only independent action here was dealing with ACS in Florida in the first place. Meadowbrook had no exclusive territories. Meadowbrook had no resale price policy. Here, Meadowbrook's policy was to sell to Whitecap or ACS anywhere. Moreover, Meadowbrook enjoys ACS's business. Meadowbrook changed its policy, that is, selling its product wherever possible, in response to threats from Whitecap and demands for acquiescence by Whitecap. The brief discusses the record at length. But, Whitecap claims in its own brief, at 25, Meadowbrook was always planning to supply ACS on just one job in Florida. My answer is, that they can tell to the jury. Which brings me to my second point. Ball denials. Counsel, this is Robin Rosendale. First of all, let me just start out by saying, I think there's a problem on the attempted monopolization claim, because I don't think there was notice that the court was going to decide that. So, I just want to take that one out of the equation right away. But, with respect to the other claims, here's my concern. What is your best evidence for there having been an agreement between Whitecap and Meadowbrook? The very best evidence would be that Meadowbrook chose to deal with ACS in Florida, and that they only changed that policy in response to the calls from Bartle, from Whitecap to Meadowbrook, threatening to pull the business, and the demand for a sit-down, and then the meeting where Meadowbrook reassured Whitecap that they would not deal with ACS anymore in Florida. So, let me say this. I see it from the Whitecap side, okay? But, I'm not sure that I see it, maybe it's there, maybe it's not, from the Meadowbrook side. And, here's why. Because, it looked to me like Meadowbrook was, from Meadowbrook's standpoint, at least what they said, was they thought that Whitecap had built up goodwill for Meadowbrook in the state of Florida, and they didn't want to lose Whitecap's business. And, more importantly, they were already backed up by a month in their engineering department. They didn't know how much more work they could actually take in Florida. And so, just from the viewpoint of Meadowbrook, where is the agreement on their part? Right. So, Meadowbrook had already made the decision to supply ACS in Florida. There were no exclusive territories. And, they were actively supplying ACS in Florida after Flagship had asked for a new distributor in Florida. And, Meadowbrook was aware of all this and was actively participating in it. It was only after, to your point, well, why are they doing it? Well, yes, they were afraid of losing Whitecap's business. Why were they afraid? Because Whitecap threatened them. They were going to pull the business. This is Judge Anderson. I agree that there was the threat. There was the threat by Whitecap to take its business away. But, that doesn't at all undermine the fact that, and the law is, as you well know, that if the evidence is at least as consistent with Meadowbrook having made an independent decision, as an agreement, then you lose. And, it seems to me, there was the threat, yes. But then, Meadowbrook made its decision to not supply plaintiff SCS anymore. And, it seems to me, there's ample reason for them to do that independently, without any agreement. Whitecap had invested substantially. It had already captured 75% of the market in Florida. If Whitecap transferred its business to Dayton, that would have been a real problem for Meadowbrook. And, not only that... Well, Your Honor, so Meadowbrook... That's what I was about to say. Not only that, they didn't think it was fair for ACS to piggyback on all the effort and goodwill that Whitecap had built up for Meadowbrook all that time. So, Meadowbrook knew all those things when it chose to supply ACS in the first place, in Florida. And, it was only literally a matter of days before they completely turned around that policy in response to the threats. They go to the... Whitecap demands the sit-down. They go to the sit-down, and literally that same day, they turn around and go down the street and tell ACS, we can no longer supply you anymore in Florida. I think the evidence is that the decision was made to stick with Whitecap and not supply ACS anymore. And then, the Meadowbrook people went and sat down with Whitecap and gave them that assurance. Is that not true? That's true, but the decision... They had just made the decision. Meadowbrook had just decided to open up ACS to supply ACS in Florida. They turned around on a dime... And as long as they turned around on a dime and did that as an independent action and not as part of a concerted action with Whitecap, then it's okay under the antitrust law. Is that not true? They can change their mind independently. They could change their mind independently if there hadn't been the threats in the first place. We have evidence that Meadowbrook had already decided independently that it was in its best interest to have an additional distributor in Florida to supply flagship. Counsel, this is Robin Rosenbaum. Sorry to interrupt, but you keep saying that Meadowbrook had decided that it wanted to do business with ACS. Maybe I misunderstood the record, so this is why I'm asking for clarification. I thought it was the decision of one individual, Mike Wolfenholme at Meadowbrook, who was dealing with ACS. But when the rest of the folks at Meadowbrook found out, they, as a company, questioned what Wolfenholme was doing and came to a different decision. Have I misunderstood this? Yes, Your Honor. So Mike Wolfenholme is the director of Tilt. He made the decision to open ACS. He made the decision to close ACS. He's the one who explained it to YCAP and he's the one who explained it to Meadowbrook. And he's the one who explained his decision within Meadowbrook as well. Mr. Wolfenholme is the one who is calling the shots to open and to close. And that's in the record and that's in the brief. I did not understand the record that way either. I understood that Wolfenholme, his decision, was called into question by what you call the smoking email. And that then brought in the higher-ups, including Crawford. And then Crawford and some other person, I forget, and Wolfenholme got together. And the three of them decided to not supply ACS anymore, to honor that one commitment that Wolfenholme had made, but not to supply ACS anymore. Is that not correct? So I recall the records. Wolfenholme testified. He was the lead man on those decisions. And the key here is, as you said, Your Honor, YCAP called the decision into question. And then Meadowbrook changed its mind. And to answer specifically your question about who changed their mind, in the emails, Mr. Arnett says that he talked to Wolfenholme again and that they would not be supplying ACS anymore. And that's where I infer, and I think a jury's entitled to infer, that Wolfenholme made the decision to close ACS as well as open them. He's the key man on these decisions, and he was the point man with YCAP as well. Even if it were Wolfenholme, I don't think the record shows that, but even if that were true, he could change his mind in an independent decision after a threat from YCAP. When he initially authorized ASC, he had no idea that YCAP would take all of its business to Dayton if they supplied ACS. He can change his mind even if it were he. Well, that's exactly the point, is that it's no longer an independent decision because he is changing his mind because of what YCAP told him. It's not an independent decision anymore. Let me move to another, if I might. It seems to me that your brief relies solely on this concerted action, this agreement, even with respect to the Section 2 attempt to monopoly claim. You say that all of your claims are based on this concerted action, this agreement. Is that not true? It's true. The claim against YCAP on Section 2 is also based on the fact that they pressured Meadowbrook not to deal with ACS in Florida. That's correct. So, if we conclude that the evidence is at least as consistent with an independent action, not only your Section 1 claim falls, but also your Section 2 claim. Yes, but I disagree with the premise, Your Honor. I don't think the question is whether all the evidence is at least as consistent. It's whether it tends to show something other than independent action. I don't have to get to a, it's more likely than not that there was a conspiracy. I just have to show that there is some evidence that tends to show that there was not independent action. If the evidence was actually in equipoise, you lose. Is that not true? No, I disagree with that, Your Honor. What does it mean when the courts say if the evidence is at least as consistent with independent action, then the claim falls? Doesn't that mean if the evidence is in equipoise? Let me go to the Monsanto quote, Your Honor. Sorry, it's a long brief. There must be some evidence that tends to exclude the possibility of independent action. I couldn't come to court and say, look, they've been terminated and I've got a hunch, but I have evidence here that Meadowbrook wasn't acting on its own. I've got the emails. I've got the demand for a sit-down. I've got Whitecap giving reassurance, all in the context of Meadowbrook just having decided to supply ACS in Florida. Each of those pieces of evidence tends to exclude the possibility of independent action. Counsel, this is Judge Lagoa. I'd like to ask a question that doesn't deal with the merits of the case, but it deals with the reassignment that you brought up. Yes. Almost every district court judge is overburdened and has massive caseloads. What would be the standard that we would apply to determine at what point a judge becomes quote, unquote, overburdened? I think it's a matter of balancing cost and benefit. Here, I'm afraid we're going to be here again in two years and a second trial again in four years. The parties have every reason to believe the decisions will keep going one way at the district court. We've already rolled the dice six or seven times in that first order. They keep coming up sevens. Whitecap figures, why settle? ACS, on the other hand, cannot afford to simply wave the white flag and live to fight another day. They compete against Whitecap every day in other parts of the country. They already have a bullseye on their back, and it would be open season, and Whitecap is more powerful than ever. The concern is that this case is better to be reassigned for a fresh start. There are still other pending motions before the court, and it would be an opportunity for a new judge to make a fresh start and for the parties to appreciate that there is a judge that's going to take a fresh look at it. I want to go back to the concerted action issue, because I do think it's very critical. The issue with dealer terminations and the reason for the Monsanto rule in the first place was the idea that people could come to court based on a hunch or a guess that maybe something is afoot. But here, we're not guessing. We've got a smoking gun, and the DeLong case tells us that all denials have to be weighed against the circumstantial evidence. In that case, in DeLong, there was no evidence that the distributor had even communicated with the manufacturer about termination of the rival distributor before that distributor was terminated. None. None. Yet the case went to the jury, because we don't take all denials on their face. They have to be weighed against the circumstantial evidence. The circumstantial evidence here is strong. The emails and the testimony. I want to talk about one more point, and that is the role of the jury in rule of reason. Before you get to that, just to get the tortious interference claim on the table, if we conclude that there is no concerted action and therefore all of your antitrust claims fall, then your tortious interference claim also falls. Is that not true? Quite possibly. I don't know that... In other words, there's a competitive privilege, and unless you have some unlawfulness, and the only unlawfulness you have argued or presented is the antitrust violation. Right. So, my reason for pause is that, obviously, it's a state law claim. There's an issue of interference. And so, I couldn't say for certain under... It's our issue that we believe there's strong evidence that Whitecap did inject itself into the decision, and this was concerted action, so I don't think it matters in this case. I... I can't point to any disagreement with your assertion, Judge Anderson. I have no questions, Judge Rosenbaum. Okay. Thank you. Mr. Berhold, your time has expired. If you want to go into your rebuttal time, you can. Otherwise, you've reserved six minutes for rebuttal. Let me go quickly into rebuttal. I mean, my rebuttal time is one more minute. Okay. Actually, I'll just stay for... I'll leave the rest for rebuttal. Let's just keep it clean and bright. Thank you. Thank you, Mr. Berhold. We'll hear from Mr. Wofford. Good morning, Your Honor. This is Russ Wofford. I represent H.D. Supply. For purposes of the briefing and this oral argument, I'm going to refer to them as Whitecap, which is the name under which they do business. It's a pleasure to be before you today. I'm not going to take much of the court's time because I think the court understands the state of the law and the record in this case. I did want to make three points. First, as to the law of concerted action under the Sherman Act, I think the court has it exactly right. If the evidence is in equipoise, then the court must find that there was no concerted action. Evidence that is as consistent with unilateral action as with concerted action is insufficient to support an inference of an agreement. That's the point on the law. The second point on the facts, I'd like to just go through three events, the three critical events in the relationships between Meadowbrook, on the one hand, and its distributors, ACS, and Whitecap, on the other hand. The first event occurred on July 13, 2016. That's the date of the email, the so-called smoking gun email, at which point Whitecap learned that Meadowbrook was supplying ACS on a single project in Florida and inquired as to why. That was a break in precedent. On that same day, July 13, there was, after that email, a very brief telephone conversation between Doug Bartle of Whitecap and Mike Wolstenholme, who was the account manager for Whitecap at Meadowbrook. The substance, the undisputed testimony it says, the substance of that brief phone call was, let's get together to understand what Meadowbrook is doing in Florida. That's the first date, July 13. The second critical date is July 20. That is the date, and we have the documentary evidence of this, and we have testimony from Mr. Crawford, Mr. Arnett, and Mr. Wolstenholme, all at Meadowbrook, that a decision was made not to support ACS in Florida beyond that single initial project. The decision was made on or about that date. It was reported up and down the chain of command from Doug Crawford to his CEO up and down to his people in Florida, Mr. Arnett and Mr. Wolstenholme, and the evidence is undisputed on that fact. That's July 20. The next critical date is July 25, five days later and almost two weeks after the initial so-called smoking gun email. It was on the 25th that Meadowbrook representatives met separately with Whitecap and with ACS and informed them of the unilateral decision that Meadowbrook had made about what it was going to do in Florida. Now, plaintiff argues that it was at that point that some kind of agreement was reached between Meadowbrook and Whitecap. That is literally impossible. That decision had been made, reported up and down the chain of command five days earlier. The facts are absolutely clear. There was no concerted action in this case, and as ACS's lawyer has admitted both today and in the briefing, that dooms both of the antitrust claims and it dooms the tortious interference claim. Because if Whitecap didn't violate the Sherman Act in Florida, what in the world did it do? It competed, and it is privileged to compete in Florida. That is not a basis for a tortious interference claim. This is the third point, your honors. Apart from that, there are independent reasons. There is no evidence that anybody other than Doug Crawford decided what Meadowbrook was going to do in Florida. And he testified without contradiction and subject to cross-examination that he hadn't been pressured by anybody at Whitecap or anywhere else. And it was his call. That's the second independent reason to dismiss the tortious interference claim. Third, there is no evidence, none, that Whitecap knew anything about the supposed agreement that had been reached between Meadowbrook and ACS on some kind of ongoing relationship in Florida. All Meadowbrook knew was there had been one project. All Whitecap knew was there had been one project. All Whitecap did was say, what's going on in Florida? And they were told there wouldn't be anything else. There's no evidence that Whitecap knew there had been some relationship established to cover more than this single project. And Whitecap cannot tortiously interfere with a relationship that it doesn't know anything about. That's the second independent basis, the third total basis, that the district court got it right and granted summary judgment on that claim as well. Counsel, this is Robin Rosenbaum. It appeared to me the district court granted summary judgment on the attempted monopolization claim, but that your client did not move for summary judgment on the claim. So, it seems like it's a problem. I mean, what are your thoughts on that? Well, your honor, number one, we did move for summary judgment on that claim on the basis of no evidence of anti-competitive effect and on the basis of no evidence of concerted action. And as ACS's lawyer has said, that claim and all of its antitrust claims depend upon concerted action. Because if we didn't agree with Meadowbrook, what did we do other than compete in Florida? Second, your honor, the... What about with respect to the issue of specific intent? Well, there was plenty of evidence of specific intent. And if you look, even at ACS's initial brief, at page 35, where they raise the argument about a possible violation of Rule 56F, a mere three pages later, on page 38, they say ACS presented direct evidence that Whitecap intended to keep its rival from competing in Florida. And it goes on and on and on with the evidence that was presented at the trial court or that could be ruled on here in this court. There was evidence of intent and that that is insufficient. But I guess my question for you is, did you raise the issue of specific intent when you moved for summary judgment on this claim? That is not in the briefing in the district court, no. Well, is that a problem? No, your honor, it's not because the Section 2 claim, attempted monopolization, requires concerted action. It requires evidence of anti-competitive effect. And the court found that those two independent bases justified summary judgment. So it's not a problem. And the court, in light of the evidence that was clearly presented to the court, the court could have ruled on this additional ground that there was no evidence of specific intent. All right. Thank you, counsel. I have nothing further for the court unless there are questions. All right. Hearing none, Mr. Berhold? You have six minutes of rebuttal time. Thank you, your honor. So I want to get back to the question of independent versus concerted action. I want to address the standard again. In an antitrust case, the court cannot ignore the evidence. They must account for the evidence that suggests that the parties acted in concert. Here, we're not operating in a vacuum. We know that Meadowbrook has decided to open up ACS. And like the court has already said, we know that Meadowbrook acted in response to the call from Bartle and the threat from Bartle at Whitecat. If it's just a matter of creating plausible deniability, any distributor can make any threats, can make any demands. The manufacturer goes back. They have their own meeting. They say, well, we've made our own independent decision. We're going to cut off the rival distributor. But that's just still a bald denial, and that's not enough under the antitrust laws. Otherwise, we would gut antitrust laws specifically and conspiracy law generally. Take the example of the ADM price-fixing case. I worked on it at the Justice Department. The FBI catches rival sales executives drawing up volume allocations on video here at the Ritz Carlton down the street from the courthouse. But let's say the CEO claims he had the final decision on product production volumes for his company, and he made that decision independently. Well, he's supposed to tell that to the jury. We already have evidence, that video that tends to exclude the possibility of independent action. And that's the case here as well. Again, Meadowbrook didn't just simply change its mind. It changed its mind after being contacted by White Cap. Yes, the biggest distributor with 75% of the market in Florida, who had threatened to pull their purchases. Was it rational for Meadowbrook to change its mind? Was it in its self-interest to change its mind? Yes, maybe so. Because it was being threatened by White Cap. That's the whole point. It's not independent action at all. I also want to turn, finally, to the role of the jury in the rule of reason. Just very quickly, on competitive harm, in this case, we've raised the evidence, the actual detrimental effects. Higher prices, higher margins. Georgia was growing faster than Florida. But prices were much higher in Florida, far much higher in Florida. As well as the potential for genuine adverse effects. White Cap had 75% of the market at the time. Now they have 100% of the market. And that's adequate for market power under Section 1. Two minutes remaining. Under graphic products, it's adequate evidence of monopoly power under McWane for Section 2. The harm is clear. And the reason for it is clear. Or at least there's enough to take it to a jury. ACS is not speculating on the role of White Cap in the termination of ACS in Florida. There is evidence that tends to exclude the possibility that Meadowbrook acted on its own. It completely reversed its decision after the threats from White Cap. And regardless of the threats, Meadowbrook changes its mind. Then Meadowbrook goes back and assures White Cap that it's going to play the rules of the game. That is clear, that is substantial, circumstantial evidence, direct evidence of concerted action. That Meadowbrook was not acting alone in a vacuum. Meadowbrook had a meeting of the minds. White Cap had a meeting of the minds with Meadowbrook. And thank you very much for your time. ACS, rest its case. Thank you, counsel.